RIBEN MARINE

Expert's Written Report
By Captain Jay Rivera

In the matter of:

**JAMES RIHA**
**vs.**
**OFFSHORE SERVICE VESSELS, LLC**

**CIVIL ACTION NO. 20-2234**
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUSIANA**



402 Big Shell Court
Corpus Christi, TX 78418
Jay.Rivera@RibenMarine.com
www.ribenmarine.com
+1 361.815.7388
April 20th, 2021

EXHIBIT
tabbies
B

## Introduction:

The undersigned, Captain Jay Rivera, has been retained by the firm of VB Attorneys to review the records, depositions, analyze the facts and issues concerning the personal injury of crew member James Riha aboard the M/V TIMBALIER ISLAND. Based on my training, education, and experience, I was asked to render an opinion as to the cause of the injury, negligence, and seaworthiness in this case.

## Summary of Events:

James Riha was employed as a mate and member of the crew aboard the M/V TIMBALIER ISLAND. Mr. Riha was injured while aboard the vessel on October 1st, 2019 at approximately 1800 hrs while assisting the vessel Master in closing the stores/provision watertight door. His left index finger was caught between the door frame and one of the dogs that secure the hatch, when the Master closed it without warning on Mr. Riha's hand. His finger was smashed, lacerated, and ripped his fingernail off. Mr. Riha was taken off the vessel for further medical treatment ashore has been suffering continuous pain, loss of dexterity in his left index finger, and discomfort in his left hand and arm since his injury.

## Contents

Introduction and Summary of Events ............................................................2

Professional Background...................................................................................3-4

Factual Overview...............................................................................................5-8

Opinions............................................................................................................8-9

Conclusions.......................................................................................................9-10

Appendix...........................................................................................................11-12

Methodology.....................................................................................................13

Professional Experience....................................................................................14-15

Fee Schedule.....................................................................................................16

Record of Testimony.........................................................................................17-20

**Professional Background:**

Captain Rivera is a graduate of Texas A&M University at Galveston, Texas Maritime Academy in 1998 with a Bachelor of Science Degree in Marine Transportation. Captain Rivera's "curriculum vitae" is included in this report. In addition to his degree, he also qualified and completed testing for his U.S. Coast Guard Third Mate Unlimited Any Gross Tons License in the same year. For the next 7 years Captain Rivera sailed on various types and sizes of US Jones Act and internationally trading tank vessels in all the officer ranks. In 2003, Captain Rivera was eligible for and obtained his United States Coast Guard issued Master Unlimited Any Gross Tons License and began sailing under authority of that license in 2004 when he was assigned command of the M/T Charleston, a 48,000-ton US flagged chemical tanker. In 2005, Captain Rivera was selected to the Aransas-Corpus Christi Pilots, where he served as a State Commissioned and Federally Licensed Harbor Pilot in the State of Texas for thirteen years. The last 2 years of his tenure, he served as Presiding Officer of the Pilot group. The Port of Corpus Christi is the fourth largest port in the nation which handles the largest and deepest vessels calling upon the US Gulf Coast and is at the epicenter of the nation's crude oil and gas trade.

In 2011, Captain Rivera received an Honorable Discharge from the US Navy as a Lieutenant Commander, after serving in the armed forces for nearly thirteen years, while working concurrently in the maritime industry. During his time in the Navy, he performed numerous active-duty trainings and served overseas piloting vessels in and out of Kuwait to support ongoing military operations in the region. Captain Rivera drafted the first Navigation Safety Guidelines for the Port of Corpus Christi in 2012. He later played a major role in the acceptance, implementation, and ratification of these Guidelines by the Board of Commissioners for the Port of Corpus Christi Authority.

In 2017, Captain Rivera planned for and successfully piloted the first Very Large Crude Carrier (VLCC) ever to enter an inland US Gulf port. Since then, Captain Rivera has been involved in the design of all proposed VLCC terminals in the Port

of Corpus Christi. Captain Rivera was awarded in 2018 the US Coast Guard's Meritorious Public Service Award. This award is the second highest honor awarded by the US Coast Guard. He was commended for his efforts in two separate events; coordinating the recovery of maritime commerce in the Port of Corpus Christi and its waterway after one of the most destructive storms ever to hit the Texas Gulf Coast, Hurricane Harvey. The second event in this award was his efforts in fighting a crude oil fire caused by a deadly explosion on a vessel offshore of Port Aransas, TX. After the fire was extinguished, he assisted and coordinated search and rescue efforts, as well as the response of the ensuing oil spill.

Captain Rivera provides marine consultancy services as a maritime expert witness, developing ship/barge docks, liquified natural gas (LNG) terminals, cargo claims, tug design, and ship channel design/modifications.

## Factual Overview:

The M/V TIMBALIER ISLAND is a Platform Supply Vessel (PSV), classed by the American Bureau of Shipping (ABS), and documented in the United Sates by the United States Coast Guard (USCG). She is 312 feet in length (LOA) and 66 feet in width (Beam) with a Gross Tonnage of 5,011 tons.

On October 1st, 2019, the M/V TIMBALIER ISLAND was moored at the RCS facility, slip A, in Port Fourchon, LA conducting tank cleaning operations. While at the berth, groceries were being loaded via the O1 deck provision door. This door is a hydraulically actuated watertight door that is secured by nine (9) manually operated dogs. The purpose of these dogs is to create a watertight seal on the provision door to prevent water ingress into the vessel. The provision door is hinged on the bottom part and swings out to open, forming a landing or platform with fold away handrails.



Figure 1
Exterior of O1 deck provision door

To close the door, the operator must use an electro/hydraulic controller that retracts the door into the closed position. The dogs must then be manually closed to secure the watertight integrity of the vessel.



Figure 2
Hydraulic control for provision door

At approximately 1800 hrs, after all the groceries were loaded, the Master of the vessel, Captain Britt Ezell was closing the provision door. Due to a malfunctioning dog, the procedure for closing the door involved a minimum of two people; one operating the hydraulic controls, the other to push the malfunctioning dogs out of the way of the door frame to allow the door to close. The top middle dog was loose and would not stay in its normal open position. It hung down blocking the door opening, preventing it from fully closing. Mr. Riha had to push the dog out of the way with his hand for the door to close.

Unbeknownst to Mr. Riha, Captain Ezell continued to close the door while Mr. Riha's hand was pushing the dog out of the way. The door then pinched Mr. Riha's left index finger between the dog and the hatch frame, causing the injury.

According to the testimony of Mr. Riha, this dog had been malfunctioning for some time and Chief Engineer Adam Graves, as well as the office, was aware of the problem (Deposition of James Riha pg.107, ln. 3-21). Mr. Graves testified in his deposition that the only maintenance that was performed on the provision door by him or his counterparts, was the single bottom right dog that he replaced (Deposition of Adam Graves pg. 62, ln. 16-24/pg. 64, ln. 10-12).



Figure 3
Interior of O1 deck provision door

Mr. Riha also testified that according to Captain Ezell, other sister vessels in the fleet with manual dogs had a conversion to automatic locking dogs performed. (Deposition of James Riha pg.108, ln. 3-12).




Figure 4
Comparison of top middle closed dog out of the way and top middle dog open dog hanging down.

## Opinions:

1. **The Master is ultimately responsible for the safe operation of the vessel:**

    a. The Master is empowered in all situations with overriding authority to act decisively and according to his/her best judgement. The Master is the Company's representative on board.

    b. His/her duty is to command and operate the vessel in accordance with applicable Federal and International regulations and with the Company's policies and procedures. The Master is always ultimately responsible for the safety of the vessel, its cargo, and its crew.

2. **It is the obligation of the ship's owner and managers, through the ship's Master, to ensure a safe working environment is always maintained aboard the vessel. The Master is required to exercise safety and authority over his crew and ensure his vessel is always safe.**

    a. Captain Ezell did not exercise this duty. He was complacent in allowing an unsafe act to occur.

    b. As the Ultimate Authority on the vessel and supervisor for the operation of closing the provision door, was neither supervising the

operation nor looking out for potential hazards. He did not look out for the safety of Mr. Riha.

3. **The operational negligence, disregard for company policies, and lack of maintenance, created an unseaworthy condition on board the M/V TIMBALIER ISLAND.**

   a. There is no record of a proper Pre-Job/Toolbox Talk being performed aboard the M/V TIMBALIER ISLAND immediately prior to operating the provision door as required by company policy.
   b. There are no maintenance records for the area surrounding the provision door nor maintenance records for the dogs themselves.
   c. Company policies regarding Personnel Protective Equipment (PPE) were not followed nor enforced by the vessel Master.

## Conclusions:

Based on my review of the record and the deposition testimony I have reached the following conclusions:

- James Riha was a seaman who was able bodied and fit for duty at the time he was employed aboard the M/V TIMBALIER ISLAND.
- As a Jones Act Seaman, James Riha was owed a seaworthy vessel. Under the Jones Act, Nautical Solutions/Offshore Vessels/Edison Chouest Offshore has a duty to provide a seaworthy vessel. To be seaworthy, the vessel, must be reasonably safe and to perform its assigned tasks. The owners of the M/V Timbalier Island breached that duty to James Riha by operating in a negligent manner, disregarding company policies, and by not performing basic maintenance procedures to avoid equipment malfunction.
- The vessel utilized improper and/or unreasonably dangerous methods of operation. The procedure for opening and closing the provision door with malfunctioning and/or damaged dogs was a causal factor of the incident. Based on the evidence provided it is my determination that the vessel was not properly maintained, and the company policies were not enforced.

- Lack of basic preventative maintenance for a known issue by ship and shore personnel which led to Riha's injury, and for which no reasonable explanation has been offered, created an unseaworthy condition. This malfunctioning dog issue could have been resolved by a simple replacement, repair, or modification of the hatch dogs.

The opinions expressed in this report are my own, are given without prejudice, and only relate to this incident.

In addition to the documentation provided to Captain Rivera by the VB Attorneys Law Firm; internationally recognized maritime reference and safety manuals and actual experience as Master on a US flagged vessel were used to arrive at the opinions and conclusions in this report. My education, training, and background were also used to arrive at the opinions and conclusions in this report.

I reserve the right to alter my opinions should any additional information become available to me.

Captain Jay Rivera
Riben Marine, Inc.