UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| JAMES RIHA | CIVIL ACTION |
| VERSUS | NO. 20-2234 |
| OFFSHORE SERVICE VESSELS, LLC f/k/a EDISON CHOUEST OFFSHORE, INC. | SECTION M (3) |

### ORDER & REASONS

Before the Court is a motion *in limine* by defendant Nautical Solutions, LLC ("Nautical Solutions") to strike the report and testimony of plaintiff's proposed liability expert, Captain Jay Rivera, and to preclude testimony and evidence regarding future medical care and economic damages from plaintiff's proposed medical expert, Dr. Craig Lichtblau; vocational rehabilitation expert, Wallace Stanfill; and economist, Dr. Kenneth Lehrer, to the extent he relies on opinions that Lichtblau and Stanfill are prohibited from providing.[1] Plaintiff James Riha responds in opposition,[2] and Nautical Solutions replies in further support of its motion.[3] Also, before the Court is a motion by Riha to supplement his expert disclosures and opposition to Nautical Solutions' motion *in limine* to include Dr. Lichtblau's untimely June 9, 2021 report.[4] Further, before the Court is Riha's motion to continue the trial and expert report and discovery deadlines,[5] to which Nautical Solutions responds in opposition.[6] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons.

---

[1] R. Doc. 35.
[2] R. Doc. 36.
[3] R. Doc. 46.
[4] R. Doc. 41.
[5] R. Doc. 42.
[6] R. Doc. 48.

**I.     BACKGROUND**

This is a maritime personal injury case. On October 1, 2019, Riha was injured while working for Nautical Solutions as a Jones Act seaman aboard the *M/V Timbaleer Island*.[7] At the time of the injury, Riha was assisting with receiving a grocery delivery through the vessel's side provisions hatch, which has manually operated "dogs" used to lock and open it.[8] To operate the door, one crew member would activate it using a hydraulic control system while another would hold the loose dogs out of the way so the door could shut.[9] Riha was holding a loose dog while Captain Britt Ezell operated the door's hydraulic controls and accidentally closed the door on Riha's left index finger.[10] Riha tried to pull his hand out of the closed door injuring his left wrist and forearm.[11]

A medic evaluated Riha, and then Riha was transported to Complete Occupational Health Services where he was diagnosed with a left index distal tuft fracture and laceration and referred for orthopedic evaluation.[12] The next day, he presented to the emergency room at the University of California San Francisco Medical Center where he was diagnosed with a distal phalanx open fracture of the left index figure, prescribed an antibiotic, and referred for orthopedic evaluation.[13]

On October 4, 2019, Dr. Mathias Masem, an orthopedic surgeon, confirmed that Riha had a moderately displaced left index finger distal phalanx tuft fracture and diagnosed left wrist tendinitis.[14] Masem recommended finger splint immobilization and restricted Riha from left-hand

---

[7] R. Doc. 1 at 2. The original complaint named Offshore Service Vessels, LLC f/k/a Edison Chouest Offshore, Inc. as the sole defendant. *Id.* at 1-2. Riha subsequently amended the complaint to substitute Nautical Solutions as the correct defendant. R. Doc. 8.
[8] R. Docs. 1 at 2; 36 at 1.
[9] R. Doc. 36 at 2.
[10] *Id.*
[11] *Id.*
[12] R. Doc. 35-1 at 2.
[13] *Id.* (citing R. Doc. 35-2).
[14] *Id.* (citing R. Doc. 35-3).

work for at least six weeks, with a follow-up appointment in three weeks.[15] Following an unsuccessful course of conservative treatment, on May 8, 2020, Masem removed a fragment of Riha's injured left index finger and wrist hardware that had been put in place after a previous injury.[16] A May 22, 2020 x-ray of Riha's left forearm and finger showed that his arm and finger remained in anatomic alignment with no evidence of fracture or other abnormalities, and the finger was healing appropriately.[17] Masem suggested that Riha wear a removable wrist brace for six weeks and begin range-of-motion exercises for his wrist and finger.[18]

On June 23, 2020, Riha underwent a medical examination to obtain a position as a mate on a Seabulk vessel.[19] He reported that he was capable of performing at full unrestricted duty without limtations.[20] Riha got the job and cancelled several follow-up visits with Masem to work offshore.[21]

On December 4, 2020, Riha saw Masem and reported that his left wrist was not causing him any problems, but that he had occasional slight pain with repetitive grasping and lifting.[22] Riha reported taking Ibuprofen "very intermittently."[23] Masem concluded that Riha "has reached maximum medical improvement [and] should be able to perform his ordinary occupational activities, without difficulty, with no restriction."[24]

Riha filed this Jones Act suit alleging that Nautical Solutions' negligence caused his injuries and seeking damages including lost wages, lost earning capacity, and pain and suffering,

---

[15] *Id.* (citing R. Doc. 35-3).
[16] *Id.* (citing R. Doc. 35-4).
[17] *Id.* at 2-3 (citing R. Docs. 35-5; 35-6).
[18] *Id.* at 3 (citing R. Doc. 35-7).
[19] *Id.* (citing R. Doc. 35-8).
[20] *Id.* (citing R. Doc. 35-8).
[21] *Id.* (citing R. Doc. 35-8).
[22] *Id.* (citing R. Doc. 35-9).
[23] *Id.* (citing R. Doc. 35-9 at 1).
[24] *Id.* (citing R. Doc. 35-9 at 3).

along with maintenance and cure.[25] On May 25, 2021, Riha provided to Nautical Solutions expert reports authored by Rivera (liability), Lichtblau (future medical care), Stanfill (vocational rehabilitation), and Lehrer (damages).[26]

On June 1, 2021, Nautical Solutions filed the instant motion *in limine* seeking to exclude or limit the testimony of Rivera, Lichtblau, Stanfill, and Lehrer.[27] Thereafter, on June 9, 2021, Lichtblau examined Riha in person for the first time and issued a "supplemental" report.[28] On that same day, Riha filed his memorandum in opposition to Nautical Solutions' motion *in limine*.[29] As a result, Riha then filed the pending motion to supplement his expert disclosures and opposition memorandum with Lichtblau's June 9, 2021 report[30] as well as the motion to continue trial and the expert report and discovery deadlines, which is primarily aimed at accommodating the "supplementation" of Lichtblau's report.[31]

## II. LAW & ANALYSIS

### A. *Daubert* Standard

A district court has discretion to admit or exclude expert testimony under the Federal Rules of Evidence. *General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 requires a district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[25] R. Doc. 1 at 3-6.
[26] R. Doc. 33.
[27] R. Doc. 35.
[28] R. Doc. 36 at 12.
[29] *Id.*
[30] R. Doc. 41.
[31] R. Doc. 42.

4

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court listed several non-exclusive factors for a court to consider in assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the methodology in the scientific community. *Id.* at 593-95. However, a court's evaluation of the reliability of expert testimony is flexible because "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quotations omitted). In sum, the district court must ensure "that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The party offering the testimony must establish its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

Next, the district court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact to understand the evidence, *i.e.*, whether it is relevant. *Daubert*, 509 U.S. at 591. An expert's testimony is not relevant and may be excluded if it is directed to an issue that is "well within the common sense understanding

of jurors and requires no expert testimony." *Vogler v. Blackmore*, 352 F.3d 150, 155 (5th Cir. 2003). Further, an expert cannot make "legal conclusions reserved for the court," credit or discredit witness testimony, or "otherwise make factual determinations reserved for the trier of fact." *Highland Cap. Mgmt., L.P. v. Bank of Am., N.A.*, 574 F. App'x 486, 491 (5th Cir. 2014).

Rule 702 also requires that an expert be properly qualified. Generally, if there is some reasonable indication of qualifications, the district court may admit the expert's testimony, and then the expert's qualifications become an issue for the trier of fact. *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded in part by statute on other grounds as noted in Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020). A witness qualified as an expert is not strictly confined to his area or practice but may testify regarding related applications; a lack of specialization goes to the weight, not the admissibility of the opinion. *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. App'x 191, 195-96 (5th Cir. 2018).

**B. Captain Jay Rivera**

Riha retained as a liability expert Rivera, a vessel captain with over 20 years of experience in the maritime industry.[32] Rivera reviewed the record and deposition testimony to issue a report that explains the facts of the accident and offers the following opinions: (1) the master, the company's representative on the vessel, is ultimately responsible for operating the vessel in accordance with applicable regulations, policies, and procedures, and is empowered to act decisively in accordance with his best judgment; (2) the vessel owner, through its master, must ensure a safe working environment, which Captain Ezell failed to do with respect to the operation of the door; (3) the vessel was unseaworthy due to operational negligence, disregard for company

---

[32] R. Doc. 35-10.

6

policy, lack of maintenance, failure to do a pre-job safety analysis, and failure to use "personnel" protective equipment.[33] Rivera further concludes that Riha was a Jones Act seaman and that Nautical Solutions breached its duty to provide a seaworthy vessel due to the malfunctioning door and lack of preventative maintenance.[34]

Nautical Solutions moves to exclude from trial Rivera's testimony, arguing that his report is principally a restatement of Riha's allegations of fact that does not offer any scientific, technical, or specialized knowledge that will assist the trier of fact.[35] In opposition, Riha argues that Rivera's maritime experience gives him specialized knowledge that relates to liability, such as the safety, maintenance, and operation of the vessel's equipment; hiring, training, and supervising the crew; the roles and responsibilities of crew members in the vessel's chain of command; required inspections and maintenance; and proper vessel documentation, including job safety analysis.[36] Riha contends that a maritime company's duty to maintain a vessel and maritime liability are topics outside the knowledge of a layperson.[37]

Although Rivera's maritime experience qualifies him to testify as an expert in marine safety, he does not offer any opinions within the realm of his expertise that would assist the trier of fact in this case. Rivera's report is largely a recapitulation of the facts alleged about Riha's injury followed by basic principles and legal conclusions about liability. He offers no opinions, and cites to no industry standards or publications, that aid in explaining how Nautical Solutions allegedly failed in terms of vessel maintenance and safety or how any lapses in the chain of command caused the accident. At its core, this case is about a door slamming on a finger – an

---

[33] *Id.* at 9-10.
[34] *Id.* at 10-11.
[35] R. Doc. 35-1 at 4-5 & 11-12.
[36] R. Doc. 36 at 10-11.
[37] *Id.*

event entirely within the purview of the jury who can apply common sense to the facts adduced at trial and the law as instructed by the Court. Because Rivera offers no opinions that would aid the trier of fact in determining liability, Nautical Solutions' motion is granted, and Rivera will not be permitted to testify at trial.

### C. Dr. Craig Lichtblau

Riha hired Lichtblau, a board-certified physical medicine and rehabilitation physician, to produce a comprehensive rehabilitation evaluation to define his impairment, disability, cost of future medical care, and life expectancy.[38] On March 4, 2021, Lichtblau issued his first report which is comprised of six sections.[39] The first, a comprehensive medical evaluation, is a summary of Riha's post-accident medical treatment and Lichtblau's impressions of Riha from a telemedicine visit, in which Lichtblau opines that Riha "sustained a significant impairment, disability, and cost for future medical care as a direct result of the injuries sustained in a work-related accident on 10/1/19."[40] Next is a vocational position statement where Lichtblau lists Riha's diagnoses and opines that Riha "is going to suffer from acute, intermittent exacerbations of chronic pain and discomfort and … he will have good days, bad days and missed days of work."[41] Third is an AMA impairment rating that again reviews Riha's diagnoses and concludes that the injury caused him to have a 1% partial impairment of the whole person.[42] The fourth section is a functional assessment setting out Lichtblau's opinion that Riha's disability will increase over time because he "suffers the secondary effects of aging, combined with his current impairment."[43] Fifth is a life care plan in which Lichtblau outlines three possible scenarios for Riha's future medical care: a

---

[38] R. Doc. 35-11 at 1.
[39] R. Doc. 35-11.
[40] *Id.* at 5-11.
[41] *Id.* at 13-14.
[42] *Id.* at 16-18.
[43] *Id.* at 20-21.

best, worst, and most probable case.[44] Lichtblau concludes with a five-page summary of his report, noting that Riha's life expectancy is 48.6 years.[45]

Nautical Solutions argues that, because Lichtblau did not examine Riha in person, the opinions expressed in his March 4, 2021 report are nothing more than a cumulative "regurgitation" of Riha's medical records.[46] Nautical Solutions further argues that Lichtblau's three life care scenarios and plans are based on statements made by Dr. Paul Murphy, an orthopedist who reviewed Riha's file without the benefit of an in-person examination of Riha, rendering them speculative.[47]

In opposition, Riha argues that the COVID-19 pandemic prevented him from seeing Lichtblau in person prior to Lichtblau issuing his initial report.[48] Riha lives in California and Lichtblau is in Florida, making an in-person visit, according to Riha, impossible in the midst of the pandemic and the resultant stay-at-home orders issued in California.[49] In an attempt to negate Nautical Solutions' argument, Riha traveled to Florida on June 9, 2021, to see Lichtblau in person, and Lichtblau produced a "supplemental" report.[50] Lichtblau's new report consists of 215 pages (over five times longer than his original report), including a functional capacity test performed at the June 9, 2021 visit and a corresponding opinion that Riha can work eight hours per day performing sedentary light work and has an 11% partial impairment of the whole person.[51] Riha argues that Lichtblau's opinions are relevant and reliable given his medical expertise.[52]

---

[44] *Id.* at 22-34.
[45] *Id.* at 36-40.
[46] R. Doc. 35-1 at 5-7 & 12-13.
[47] *Id.*
[48] R. Doc. 36 at 12.
[49] *Id.*
[50] R. Doc. 41. Riha's motion to supplement his opposition to include Lichtblau's June 9, 2021 supplemental report (R. Doc. 41) is GRANTED as to allowing the report into the record for the limited purpose of comparing it to Lichtblau's March 4, 2021 report.
[51] R. Doc. 41-5 at 12-57.
[52] R. Doc. 36 at 12-13.

Nautical Solutions' motion *in limine* is directed to Lichtblau's March 4, 2021 report. Although Lichtblau did not conduct an in-person physical exam of Riha prior to issuing that report, he has the medical expertise to render his opinions relevant and reliable. Nautical Solutions is scheduled to depose Lichtblau on July 14, 2021, and can explore with him his opinions and theories, along with the bases and perceived shortcomings of his opinions, at that time. Lichtblau's opinions can also be tested at trial via vigorous cross-examination and the presentation of countervailing expert testimony. Moreover, at trial, the Court will entertain contemporaneous objections to hearsay and cumulative testimony as those issues arise concerning Lichtblau's recitation of Riha's medical history.

But the Court will not permit Lichtblau to testify as to any new information or opinions contained in his untimely June 9, 2021 report, including his in-person examination of Riha. Further, the Court will not permit Riha to supplement his expert disclosures with Lichtblau's June 9, 2021 report nor will it continue the expert report deadline or trial to accommodate that proposed supplementation. Riha uses the COVID-19 pandemic as an excuse for why he did not see Lichtblau in person prior to the expert report deadline. The record is clear, however, that Riha was able to, and indeed did, travel during the COVID-19 pandemic in spite of California's stay-at-home orders. Thus, Riha has not shown that the pandemic (or any other factor) constitutes good cause for extending the scheduling order's deadlines. Moreover, Litchblau's new report is not a true supplement of his original report; it expresses entirely new opinions. Allowing Lichtblau's untimely new opinions, some of which contradict the opinions expressed in his initial report, would prejudice Nautical Solutions which has adhered to the scheduling order. As such, Riha's motion

to continue is denied, as is Riha's motion to supplement his expert disclosures with Lichtblau's June 9, 2021 report.[53]

### D. Wallace Stanfill

Stanfill is a vocational rehabilitation expert.[54] He reviewed Riha's education and work history, along with his medical records, to determine that, post-accident, Riha is limited to light sedentary work for which he would likely earn minimum wage, which is approximately $31,000 per year in California.[55] At the time of the accident, Riha was working as a third mate earning $65,000 to $75,000 per year.[56] Stanfill noted that Riha intended to work his way up the ranks to second mate, chief mate, master, and eventually harbor pilot.[57] According to Stanfill, a ship's master has an annual earning potential of $154,000, and a harbor pilot's earning capacity is $455,000 to $755,000 per year.[58] Stanfill opines that Riha had a "fair to good" chance of eventually becoming a harbor pilot.[59]

Nautical Solutions seeks to exclude Stanfill's opinions on the wages of a ship's master and a harbor pilot because there is no evidence that Riha would achieve such goals.[60] Riha had not taken any steps to do so and there is no support for Stanfill's statement that Riha's chance of doing so was fair to good.[61] In opposition, Riha argues that he has a track record of high performance in the maritime industry and it should be left up to the jury to decide which of the three career paths, chief mate, master, or harbor pilot, he was most likely to achieve.[62]

---

[53] The Court will, however, consider extending the discovery deadline to accommodate depositions of Riha's treating physicians.
[54] R. Doc. 35-12.
[55] *Id.* at 1-8.
[56] *Id.* at 8.
[57] *Id.* at 6-7.
[58] *Id.* at 8.
[59] *Id.*
[60] R. Doc. 35-1 at 7-8 & 13-16.
[61] *Id.* at 15.
[62] R. Doc. 36 at 14-18.

Nautical Solutions largely bases its argument for excluding Stanfill on *Gilmore v. WWL-TV, Inc.*, 2002 WL 31819135 (E.D. La. Dec. 12, 2002). In *Gilmore*, the plaintiff was a legal secretary residing in Louisiana who danced as a Saintsation for a few football seasons. *Id.* at *5. After sustaining an ankle injury, she filed suit against the alleged tortfeasor seeking damages, including lost earning capacity. *Id.* at *1. Gilmore did not produce timely a vocational rehabilitation expert report, but sought an award of lost earning capacity for the amount she claims she could have earned as a professional dancer in New York City until the age of 70. *Id.* at *3-4. The court prohibited Gilmore from presenting lay or expert testimony regarding this lost earning capacity because she never danced in New York or made any move to pursue such a career, never earned a living wage from dancing, and could not offer any competent evidence as to the salary and career length of a professional dancer in New York because she had no first-hand knowledge thereof. *Id.* at *5-6. The court noted that, while a plaintiff is entitled to recover loss of earning capacity for what she could have earned and though absolute certainty is impossible, the award must have some basis in reality, which was completely lacking in Gilmore's professed aspiration of dancing in New York into her sunset years. *Id.* at *6.

Although the case at bar has some facts that make *Gilmore* distinguishable, the decision is nevertheless instructive. Thus, for example, the Court recognizes that, unlike Gilmore's ethereal dancing career, Riha was earning a living wage from working in the maritime industry and had a proven (albeit limited) track record of moving into higher positions.[63] Like Gilmore, however, there is no evidence or inference that he would one day achieve his claimed (but previously unexpressed) aspiration of achieving the highest echelon of his chosen profession. While the evidence suggests that Riha was a good worker, there is no evidence that Riha had applied to be a

---

[63] R. Doc. 35-12 at 4.

master or pilot or that his employer hed encouraged him to do so. *Cf. Kennedy v. Magnolia Marine Transp. Co.*, 189 F. Supp. 3d 610, 617-18 (E.D. La. 2016) (court unable to conclude that plaintiff becoming a pilot was merely "possible," as opposed to probable, because plaintiff's employer had encouraged him to apply for the pilot program); *Singleton v. United States*, 2021 WL 765384, at *11-12 (E.D. La. Feb. 26, 2021) (court found that plaintiff with 20 years of experience in offshore industry would continue to progress toward high earnings when he had been approved for an exclusive training program). Stanfill does not offer any analysis of the maritime industry that would demonstrate the likelihood that Riha would rise through the ranks or the time frame necessary for such an ascent. Without such an analysis, there is no evidence to support that it is probable, rather than merely possible, that Riha would become a vessel master or harbor pilot. Stanfill does mention that Riha was putting in the sea-hours to achieve a higher mate status. Due to Stanfill's failure to adequately analyze a mariner's career path, Stanfill's opinion that, prior to the injury, Riha would have had a "fair to good" chance of becoming a master or pilot amounts to inadmissible speculation. Thus, Nautical Solutions' motion to limit Stanfill's testimony on future lost earning capacity is granted, and Stanfill will be limited to discussing lost earning capacity up to the rank of chief mate.

**E. Dr. Kenneth Lehrer**

Lehrer is Riha's economist engaged to testify about damages based on his own analysis and the analyses of other experts, including, particularly, those of Lichtblau and Stanfill. Nautical Solutions seeks to limit Lehrer's testimony on future medical care and lost earning capacity in accordance with the limitations it seeks on the testimony of Lichtblau and Stanfill.[64] Because this Court denies Nautical Solutions' motion to limit the testimony of Lichtblau as to the March 4,

---

[64] R. Doc. 35-1 at 16.

2021 report,[65] but granted the motion to limit Stanfill's testimony, the motion to limit Lehrer's testimony is likewise denied as it relates to Lichtblau's opinions and granted as it relates to Stanfill's. Thus, Lehrer may not testify as to any calculations based on the opinions Stanfill is prohibited from offering.

## III. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Nautical Solutions' motion to strike Rivera (R. Doc. 35) is GRANTED.

IT IS FURTHER ORDERED that Nautical Solutions' motion to preclude testimony and evidence regarding future medical care and economic damages offered by Lichtblau (R. Doc. 35) is DENIED as to the opinions expressed in Lichtblau's March 4, 2021 report, but Lichtblau's testimony will be limited to the opinions in that report.

IT IS FURTHER ORDERED that Nautical Solutions' motion to preclude testimony and evidence regarding future medical care and economic damages offered by Stanfill (R. Doc. 35) is GRANTED, and Stanfill's testimony on Riha's future earning capacity is limited to his earning capacity up to the level of a chief mate.

IT IS FURTHER ORDERED that Nautical Solutions' motion to preclude testimony and evidence regarding future medical care and economic damages offered by Lehrer (R. Doc. 35) is GRANTED, and Lehrer is prohibited from offering opinions based on any opinions of Lichtblau and Stanfill prohibited by this order.

---

[65] Lehrer did not issue a supplemental report addressing the opinions expressed in Lichtblau's untimely June 9, 2021 report. Thus, as to Lichtblau, Lehrer's report is confined to the opinions in Lichtblau's March 4, 2021 report. In other words, Lehrer cannot testify about matters addressed in Lichtblau's June 9, 2021 report.

IT IS FURTHER ORDERED that Riha's motion to supplement his expert disclosures and opposition memorandum to include Lichtblau's June 9, 2021 report (R. Doc. 41) is DENIED as to supplementing such disclosures, and GRANTED as to supplementing the opposition memorandum for the limited purpose of comparison with Lichtblau's March 4, 2021 report.

IT IS FURTHER ORDERED that Riha's motion to continue (R. Doc. 42) is DENIED.

New Orleans, Louisiana, this 6th day of July, 2021.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE